OPINION OF THE COURT
Daniel Turbow, J.
Petitioner is the mother of Thomas L. C., who was born on September 1, 1983. On August 27, 1997, she commenced the instant proceeding against the respondent, seeking a declaration of paternity and an order of support. The respondent thereafter moved to dismiss the petition, asserting that it was barred by the terms of an agreement (the Agreement) entered into pursuant to Family Court Act § 516. That Agreement, which was approved by the Family Court, New York County, in 1987, resolved a paternity proceeding the mother had brought against respondent in that forum the preceding year.
By order and findings dated December 18, 1997, the Hearing Examiner granted the motion to dismiss. Petitioner thereupon filed objections to the order and findings. During the course of subsequent briefing, a Law Guardian was appointed, who submitted papers opposing dismissal of the petition. In addition, upon application of the petitioner and Law Guardian, because issues relating to the constitutionality of Family Court Act § 516 were raised, pursuant to Executive Law § 71 the court afforded the Attorney General notice of the matter and the opportunity — which was declined — to appear. The court now denies petitioner’s objections and affirms the Hearing Examiner’s dismissal of the petition.
*243 A. The Prior Proceedings and the Agreement[1]
Petitioner commenced the earlier paternity proceeding on June 12, 1986, seeking the same relief sought here. (Clara C. v William L., Fam Ct, NY County, index No. P2428/86.) Thereafter, upon respondent’s motion, blood tests were ordered. Those tests revealed a 99.9% probability of respondent’s paternity. Nonetheless, rather than pursuing the suit, on April 16, 1987 and with the advice of counsel,[2] petitioner opted to settle her claims by entering into the Agreement.
Under the Agreement, without admitting paternity, respondent agreed to pay petitioner the monthly sum of $275 as child support until Thomas’ 21st birthday and, in addition, to maintain a life insurance policy to secure the payment obligation. In return, assuming compliance with respondent’s obligations, petitioner agreed to the dismissal of the pending suit and neither to seek child support nor to commence another paternity proceeding in the future:
“1. This agreement is the total and complete understanding between the parties. It is in full settlement of all claims against William L. by Clara C. and Thomas L.C., past, present, and future, for the past, present, and future support and education of Thomas L.C., Clara C. agrees that neither she nor her son will bring any further claim for the support and education of Thomas L.C., against William L. * * * except to the extent that he is not in compliance with the terms of this Agreement * * *
“3. Clara C. agrees that, in consideration of the payments to be made pursuant to this Agreement, the pending paternity proceeding will be dismissed with prejudice, provided that respondent fully complies with the terms of this Agreement, and that she will not in the future institute paternity proceedings in any court in any jurisdiction to establish that William L. is the natural father of the child, provided that respondent fully complies with the terms of this Agreement.”
Following the Agreement’s execution, respondent submitted a document to the court entitled “Verified Petition for Approval *244 of Agreement and Compromise”, by which he requested that the Agreement “be approved and confirmed pursuant to Section 516 of the Family Court Act.” On May 8, 1987, the application for approval was heard in open court and on the record at a brief proceeding at which the parties, their counsel, and a representative of the Department of Social Services appeared. On July 10, 1987, the presiding Judge approved the settlement.
B. The Parties’ Positions
Respondent’s dismissal motion is predicated upon the language of the Agreement quoted above which, if operative, plainly bars prosecution of the instant proceeding.[3] Specifically, he asserts that limiting language must be given effect under Family Court Act § 516, which provides:
“Agreement or compromise
“(a) An agreement or compromise made by the mother or by some authorized person on behalf of either the mother or child concerning the support of either is binding upon the mother and child only when the court determines that adequate provision has been made and is fully secured and approves said agreement or compromise.
“(b) No agreement or compromise under this section shall be approved until notice and opportunity to be heard are given to the public welfare official of the county, city or town where the mother resides or the child is found.
“(c) The complete performance of the agreement or compromise, when so approved, bars other remedies of the mother or child for the support and education of the child.” (Emphasis added.)
Respondent contends that all the preconditions set forth in the statute have been satisfied: the Agreement did indeed compromise the prior paternity proceeding in which support was *245 sought; it was approved by the court; and it has been fully performed by respondent.[4]
By contrast, the petitioner and Law Guardian raise several distinct factual and legal arguments why the Agreement should not be given effect. As a factual matter, petitioner contends that respondent failed to comply with the terms of the Agreement in that he was delinquent in some support payments and failed to maintain an insurance policy for the child’s benefit. Under the terms of the Agreement and section 516 (c), were there such a default, petitioner would not be precluded from pursuing her petition.
The Law Guardian focuses factually on the alleged inadequacy of the judicial process by which the Agreement was approved by the Family Court in 1987. She notes that section 516 (a) requires the court reviewing an agreement to determine that “adequate provision” has been made for the child and that it is secured. Here, citing to the minutes of the approval hearing,[5] the Law Guardian argues that the review tmdertaken by the court of the Agreement’s adequacy and the parties’ finances was insufficiently cursory. Moreover, no Law Guardian was appointed to represent the child’s interests at the approval hearing to assure that his interests were protected. Accordingly, because the dictates of section 516 were not satisfied in this regard, the Agreement cannot be enforced.
As a legal matter, the petitioner and Law Guardian point to the 1987 blood tests results as de facto establishing respondent as Thomas’ father, and argue that respondent may not utilize section 516 to escape the obligation imposed upon parents by the Family Court Act to support their children. (See, Family Ct Act § 413 [1] [a] [dealing with children of a marriage]; § 513 [dealing with children born out of wedlock].)[6] According to this construction, section 516 only permits enforceable agreements concerning support to which a nonparent is a party.
*246 Finally, but perhaps most significantly, petitioner and the Law Guardian note that under Family Court Act § 461, any agreements concerning support entered into by parents of a child born in wedlock are always subject to modification by the court based upon the child’s needs. (See, Matter of Brescia v Fitts, 56 NY2d 132 [1982].) To the extent section 516 permits the support entitlement of a child born out of wedlock to be fixed forever by contract, as it purports to do here, it is unconstitutional in that it authorizes disparate treatment of such illegitimate children in violation of the Equal Protection Clause of the Fourteenth Amendment.
C. Discussion
Before turning to the merits of the instant controversy it is important to place our discussion in context. It cannot be gainsaid that resolution of this suit will, of necessity, likely impact upon Thomas. However, while he has the independent right to bring a claim for paternity and support (Family Ct Act § 522), the only dispute before the court is one brought by the petitioner mother against the putative father. This distinction is critical, since the mother’s rights and the child’s rights may not be identical. {See, e.g., Matter of Marytherese M. v Lee W., 213 AD2d 647, 648 [2d Dept 1995] [Court enforces section 516 agreement to bar paternity or support claim by mother, but holds that illegitimate child may “pursue her substantial other rights”, including those inheritance rights set forth in EPTL 4-1.2 which are predicated upon establishment of paternity]; see also, Matter of Brescia v Fitts, supra, 56 NY2d, at 139 [1982] [discusses distinction between mother “asserting her own interest in having the father contribute more to the financial burden of raising the child” and “the child’s right to receive adequate support”].)
Accordingly, while the parties have briefed the difficult issue whether Thomas may be bound by the Agreement under *247 the doctrine of res judicata or concepts of privity,[7] no justiciable claim raising that issue has been presented, and nothing stated herein should be construed as providing its resolution. Rather, the only issue before the court is the validity of the Agreement as a limitation upon the mother’s right to proceed. And, for the reasons set forth below, the court finds that the Agreement does permissibly impose such a limitation.
The factual arguments of petitioner and the Law Guardian may be summarily dispatched. First, it is evident that petitioner’s contention concerning respondent’s alleged failure to perform his obligations under the Agreement must fail. Insofar as she asserts that respondent did not make the required monthly support payments in a timely fashion, each alleged delinquency was rarely more than a few days’ duration. Such a minor failing to conform with the literal terms of the Agreement does not constitute a substantive breach of respondent’s duty which would be sufficient to undermine the Agreement’s efficacy or excuse petitioner’s continued obligation thereunder. (See generally, Jacob & Youngs v Kent, 230 NY 239 [1921].)
The materiality of respondent’s alleged failure to maintain life insurance for Thomas’ benefit would perhaps present a somewhat closer question. However, the documentary evidence belies the merits of that substantive claim. The terms of the Agreement simply did not require the maintenance of a policy specifically naming Thomas as its beneficiary. Rather, they only required the maintenance of a policy in prescribed amounts so that in the event of respondent’s death prior to the “completion of payments under [the] [A]greement,” the funds would be available to satisfy respondent’s outstanding obligations. There is no question that respondent did in fact maintain such a policy.[8] In addition, the Agreement itself prescribed the specific remedy for the respondent’s failure to maintain such a *248 policy, to wit, the bringing of a claim against the estate. Where such a remedy is particularly set -out, it cannot be said that it was in the parties’ contemplation that an additional remedy would be the complete vitiation of the Agreement itself. (See, e.g., Higgins & Sons v State of New York, 20 NY2d 425, 428 [1967] [when interpreting a contract, “A specific provision will not be set aside in favor of a catchall clause”].)
Moreover, in this regard the obvious merits reiteration: petitioner has raised her claims of respondent’s inadequate performance a full 10 years after the Agreement was signed, during which time she has been accepting the benefits of that performance. In this context it plainly would be inequitable to permit her to avoid her commitments. Indeed, in Avildsen v Prystay (171 AD2d 13, 16 [1st Dept 1991]), the First Department expressly endorsed the application of a section 516 agreement as a bar to a paternity and support proceeding where the mother challenged the legality of agreement eight years after its execution, and after she had repeatedly obtained its benefits: “Research has disclosed no case where a party has gone to law to extract every benefit obtainable under a contract, and has thereafter been permitted to repudiate the reciprocal obligations then regarded, with the benefit of hindsight, as too onerous.”
For similar reasons, the Law Guardian’s assertions concerning the alleged inadequacy of the process by which the Agreement was approved must be rejected. It may be that, were the court writing on a clean slate, a more thorough review of the Agreement’s adequacy might be deemed salutary. However, the review was had almost 12 years ago, and there is no legal or factual basis upon which it might be second-guessed. Any such tardy endeavor to undermine the Agreement would run directly contrary to the oft-stated principle that, “Stipulations of settlement are favored by the courts and not lightly cast aside.” (Hallock v State of New York, 64 NY2d 224, 230 [1984].)
The Court of Appeals in Hallock went on to emphasize the significance of this principle and its effect in circumstances such as that at issue here: “This [doctrine’s importance] is all the more so in the case of ‘open court’ stipulations * * * where
*249 strict enforcement not only serves the interest of efficient dispute resolution but also is essential to the management of court calendars and integrity of the litigation process. Only where there is cause sufficient to invalidate a contract, such as fraud, collusion, mistake or accident, will a party be relieved from the consequences of a stipulation made during litigation.” (Hallock v State of New York, supra, at 230 [emphasis added]; see also, Matter of Rebell v Trask, 220 AD2d 594, 597 [2d Dept 1995] [“(A) settlement produces finality and repose upon which people can order their affairs * * * ‘These interests are advanced only if settlements are routinely enforced rather than becoming gateways to litigation’ ”] [citations omitted].)
These policies have been directly invoked by the Second Department in upholding the validity of agreements executed pursuant to section 516. (Matter of Marytherese M. v Lee W., 213 AD2d 647, supra; see also, Bacon v Bacon, 46 NY2d 477, 480 [1979] [upholding the constitutionality of section 516, finding that, “By furnishing an incentive to settle, the statute serves to prevent the illegitimate child’s support from becoming lost in the intricacies of the adjudicatory process”]; Avildsen v Prystay, supra.) They plainly control this controversy. Neither petitioner nor the Law Guardian has set forth any factual arguments that would warrant setting aside the Agreement.
The legal arguments proffered by the petitioner and Law Guardian present somewhat closer issues. However, upon examination they too cannot withstand scrutiny.
As an initial matter, the court accepts as correct the hypothesis that a parent who has an obligation to support a child cannot permanently fix that obligation by contract with the other parent, and that it makes no difference whether the child has been born of married parents or out of wedlock. The courts of this State have repeatedly held that married parents’ child support obligations as imposed by Family Court Act § 413 cannot be made immutable by agreement. They are, instead, always subject to review and modification by the court, which must concern itself primarily with the needs of the child. (See, e.g., Matter of Brescia v Fitts, 56 NY2d 132, supra; Matter of Boden v Boden, 42 NY2d 210 [1977]; Priolo v Priolo, 211 AD2d 627 [2d Dept 1995].) The rationale underlying that principle, which is effectively codified in Family Court Act § 461 (a), is straightforward: “A husband and wife, in entering into a separation agreement, may include in that agreement provisions pertaining to the support of the children of their mar *250 riage. The terms, like any other contract clauses, are binding on the parties to the agreement. The child, on the other hand, is not bound by the terms of the agreement * * * and an action may be commenced against the father for child support despite the existence of the agreement * * * In deciding the amount of child support to be awarded, the Family Court is not constrained by the terms of the separation agreement, but rather must look to the facts and circumstances of each case individually and determine the amount of support necessary. The key consideration, of course, is the best interest of the child, insuring that the child be adequately provided for” (Matter of Boden v Boden, supra, 42 NY2d, at 212; see also, Priolo v Priolo, supra, 211 AD2d, at 629 [“ ‘([T]he) parental duty of child support is not diminished by the existence of a separation agreement or a judgment of divorce’.”] [citations omitted]).
There apparently is little case law analyzing the precise issue whether the same rule should apply to children of unmarried parents. (But see, Matter of Michelle W. v Forrest James P., 218 AD2d 175 [4th Dept 1996] [support agreement between adjudicated father and mother of illegitimate child set aside as insufficiently protecting child’s interests].) This court, however, has little doubt that the rule is applicable. Illegitimate children have the identical needs as legitimate children. Their parents are subject to the virtually identical support obligations as are the parents of legitimate children. (Compare, Family Ct Act § 413, with § 513.)[9] And the court’s duty to assure that their needs are met is not in any way diminished by the marital status of their parents. In sum, there is absolutely no reason why the doctrine of Boden (supra) and its progeny should not govern agreements fixing the support of unmarried parents. Indeed, under the equal protection principles to be discussed below, to treat legitimate and illegitimate children differently in this regard would raise significant constitutional issues. (See, e.g., Mills v Habluetzel, 456 US 91, 92 [1982] [“(O)nce a State posits a judicially enforceable right of children to support from their natural fathers, the Equal Protection Clause of the Fourteenth Amendment prohibits the State from denying that same right to illegitimate children.”].)
This conclusion, however, begs the question presented here. The principles of Boden (supra) apply where parents of legitimate or illegitimate children seek to avoid or modify the obliga *251 tions imposed upon them by Family Court Act § 413 or § 513, respectively. Here, however, no order of filiation was ever entered. Accordingly, there is no predicate for the imposition of any support obligation whatsoever under Family Court Act § 513, and the principles of Boden are simply inapplicable. •
It is true that both section 413 and section 513 do indeed impose obligations upon a “parent.” Here, the Law Guardian and petitioner point to the blood test results obtained at the time of the prior litigation, and assume that respondent is a “parent” of Thomas. Accordingly, they argue that he must be subject to the ever-reviewable support obligations of Family Court Act § 513. The Law Guardian and petitioner, however, miss a critical point. Under the Family Court Act, regardless of the likelihood of paternity, no final support obligation may be imposed upon the putative father of a child until paternity is formally established.[10] (See, Family Ct Act § 545 [1] [“In a proceeding in which the court has made an order of filiation, the court shall direct the parent * * * to pay * * * a fair and reasonable sum * * * for such child’s support and education”]; Matter of Commissioner of Social Servs. [Adriana G.] v Ruben O., 80 NY2d 409, 415 [1992]; see also, 46 NY Jur 2d, Domestic Relations, § 780, at 330 [“An order of filiation granted by a court of competent jurisdiction is a necessary prerequisite to the enforcement of the statutory liability of the father of an illegitimate child.”]; 5 Brandes, Law and the Family, New York, § 4:1, at 531 [2d ed rev] [“The support obligation of the father of a child born out of wedlock is not enforceable unless the man has been determined to be the child’s father in a judicial proceeding, or has acknowledged paternity in open court, or has executed a written verified statement.”].) Accordingly, there is no basis to impose any obligation upon respondent under section 513. Rather, respondent’s support obligation springs solely from the Agreement and, under section 516, he was entitled to limit that obligation by contract with the petitioner mother.
It must be acknowledged that, given the blood tests results presented here, this holding may at first seem to elevate form over substance. That is not the case. The argument of the Law Guardian and the petitioner reduces itself to the proposition that the need for an order of filiation as a precondition to a support order may be obviated entirely upon presentation of a *252 sufficiently convincing blood test[11] result. Such a conclusion is untenable. First, under Family Court Act § 532, while a 95% or greater probability of paternity is presumptively persuasive, a different conclusion is applicable where there is 94% or lesser probability. (See, Family Ct Act § 532.) The choice of applicable legal principles — and the viability of a section 516 agreement— cannot hinge solely upon such variations.
Moreover, even where biological parentage is established, a finding of paternity or support may not necessarily be warranted. For example, principles of estoppel may be invoked to preclude an order of paternity being issued to the apparent biological father. (See, e.g., Matter of Richard W. v Roberta Y., 240 AD2d 812 [3d Dept 1997]; Matter of Ettore I. v Angela D., 127 AD2d 6 [2d Dept 1987].) Conversely, there are circumstances where an order declaring a man to be the father is warranted even where the blood test results have excluded him from biological parentage. (Matter of Anton W. v Nadine V., 157 Misc 2d 467 [Fam Ct, Bronx County 1993].) In short, there are rules attendant to the resolution of paternity proceedings that are more than mere formalities — they cannot be ignored solely upon presentation of blood test results which purport to establish biological parentage.
In addition, to treat the blood test results alone as conclusively creating a support obligation under section 513 would impermissibly eliminate the right, expressly granted by the Legislature in section 516, of a putative father and a mother to settle a paternity and support proceeding. The teaching of the First Department in Avildsen v Prystay (171 AD2d 13, supra) is particularly instructive in this regard. There, two weeks after the putative father and mother executed a section 516 agreement, blood test results were received establishing a 99% likelihood of paternity. Subsequently, the mother sought to set aside the agreement. The Court rejected the effort: “[The blood test results] should not alter the finality or stability of the arrangement. If that had been crucial, the parties would have been free to defer finality until the test results were known; but, for whatever reason, they chose not to adopt this course. The outcome of the postagreement test procedure, clearly within the contemplation of the parties at the time the agreement was made, was not reserved by either as a future escape hatch for its alteration * * * Therefore, in our view, no tribunal of the State is now competent, eight years later, to revise the *253 settlement.” (Supra, at 15-16.) A fortiori, if a section 516 agreement may not be undone when blood tests appearing to establish biological paternity are obtained after the agreement’s consummation, an agreement cannot be undone where, as here, the parties had full knowledge of the blood test results when they entered into their contract.
Finally, we reject the contention that, on the facts here, section 516 discriminates against illegitimate children in violation of the Equal Protection Clause of the Fourteenth Amendment.
In 1979, the Court of Appeals in Bacon v Bacon (supra) found section 516 constitutional. The Court construed the statute as treating illegitimate children differently than legitimate children, but found that classification permissible. It noted that “[statutory classifications premised upon illegitimacy will withstand scrutiny so long as they are ‘substantially related to permissible state interests.’ ” (46 NY2d, at 479, quoting Lalli v Lalli, 439 US 259, 265 [1978].) And there were two “legitimate ends * * * fostered by” the statute. (Bacon v Bacon, at 480.) First, it advanced the salutary purpose, discussed fully above, of encouraging compromise of litigation: “[T]he statute encourages putative fathers to settle paternity claims, thereby reducing the necessity for legal proceedings. Certainty as to the father’s future obligation is achieved by affording the settlement agreement binding effect. Yet, the interests of the child and mother are protected”. (Supra.) Second, section 516 advanced the interest of assuring adequate support for the concerned child, by eliminating the unpredictability of the litigation process: “[T]he challenged statute helps to ensure that the child will not be without support from his father. Paternity proceedings have traditionally involved complex and difficult problems of proof, and uncertainty as to the outcome is ever present * * * By furnishing an incentive to settle, the statute serves to prevent the illegitimate child’s support from becoming lost in the intricacies of the adjudicatory process.” (Supra [citations omitted].)
Petitioner and the Law Guardian argue that Bacon (supra) is no longer good law because the Supreme Court has since assertedly held that laws creating classifications based upon illegitimacy must be measured against a stricter standard than utilized by the Court of Appeals. Specifically, they argue that in a series of cases examining the constitutionality of statutes imposing limitation periods upon an illegitimate child’s right to bring a paternity proceeding, the Court held that such laws *254 are to be subjected to a “level of intermediate scrutiny.” (Clark v Jeter, 486 US 456, 461 [1988]; see also, Pickett v Brown, 462 US 1 [1983]; Mills v Habluetzel, 456 US 91, supra.) Therefore, to be upheld, the challenged classification “must be substantially related to an important governmental objective.” (Clark v Jeter, supra, 486 US, at 461.) According to the petitioner and Law Guardian, this standard cannot be satisfied here because the State’s interest, discussed in Bacon, of encouraging resolution of uncertain paternity claims, has largely been obviated by progressively accurate genetic testing. There are a number of reasons why this analysis cannot withstand scrutiny.
First, in the decade since Clark v Jeter (supra), the appellate courts of this State have repeatedly reviewed and enforced section 516 agreements without any suggestion that they were constitutionally suspect. (See, e.g., Andre v Warren, 248 AD2d 271 [1st Dept 1998]; Matter of Marytherese M. v Lee W., 213 AD2d 647, supra; Avildsen v Prystay, 171 AD2d 13, supra.) Indeed, in 1992, in Matter of Commissioner of Social Servs. (Adriana G.) v Ruben O. (80 NY2d 409, supra), the Court of Appeals, while finding that a section 516 agreement could not bind the Commissioner of Social Services as assignee of the rights of a mother of a child receiving public assistance, never questioned that the agreement was enforceable against the mother. This precedent strongly counsels against a finding of unconstitutionality.
Second, the court is not persuaded that the Law Guardian and petitioner’s reading of the Supreme Court’s decisions is correct. Although the Clark Court did note that the “intermediate level of scrutiny’ quoted above had “generally * * * been applied to discriminatory classifications based on sex or illegitimacy’, it went on to comment that the same standard was not necessarily the appropriate touchstone by which all statutes creating classifications based upon legitimacy must be tested: “[Applying intermediate scrutiny,] we have invalidated classifications that burden illegitimate children for the sake of punishing the illicit relations of their parents, because Visiting this condemnation on the head of an infant is illogical and unjust.’ * * * Yet, in the seminal case concerning the child’s right to support, this Court acknowledged that it might be appropriate to treat illegitimate children differently in the support context because of ‘lurking problems with respect to proof of paternity.’ Gomez v. Perez, 409 U. S. 535, 538 (1973).” (Clark v Jeter, supra, 486 US, at 461 [citations omitted; emphasis added].) Moreover, in both Mills and Pickett (supra), which *255 were relied upon extensively in Clark, the Court phrased the controlling test as requiring an examination of whether the classification is “ ‘substantially related to a legitimate state interest.’ ” (Pickett v Brown, supra, 462 US, at 8, quoting Mills v Habluetzel, supra, 456 US, at 99.) That is virtually identical to the standard adopted by the Bacon Court.
In any event, even if the standard utilized in Clark (supra) and urged by the petitioner and Law Guardian is applicable, the .statute withstands constitutional scrutiny in the instant context. For, it must be remembered that, as construed herein, the statute would not permit disparate treatment between legitimate and illegitimate children whose parents were obligated to provide support under section 413 or section 513. In both cases, such parents could not contract to fix their obligations. Rather, the only disparate treatment permitted by the instant construction is that between children of parents who are subject to obligations under section 413 or section 513, and those as to whom paternity has not yet been established — and are therefore not subject to such obligations. In this context, for all the reasons stated by the Bacon Court, the classification created is “indeed substantially related to an important governmental objective.” We need not repeat that discussion again.
Nor are the objectives recited by the Bacon Court made any less significant by improved genetic testing. It is true that such testing has frequently made it easier to establish paternity. It is also true that such improved testing has been alluded to as a factor in the Supreme Court decisions striking down statutes imposing unreasonably short limitations periods for the commencement of paternity proceedings. However, in those circumstances, the governmental interest purportedly advanced by the limitations period was the oversight of fraudulent claims of paternity. The existence of blood test results which could, with 99% certainty, exclude a putative father from biological parenthood helped ease that concern without requiring resort to an exceptionally brief limitations period. (See, e.g., Mills v Habluetzel, supra, 456 US, at 104, n 2 [O’Connor, J., concurring] [“The State’s concern about stale and fraudulent claims is substantially alleviated by recent scientific developments in blood testing dramatically reducing the possibility that a defendant will be falsely accused of being the illegitimate child’s father.”].)
By contrast here, the existence of blood test results does not diminish the importance of section 516 as a tool for advancing *256 the governmental interests articulated by the Bacon Court. As discussed above, there are many circumstances where test results simply will not resolve the issue of paternity. Consequently, all the interests stated by the Bacon Court — including the value of the parties reaching an accord when faced with the unpredictability of a suit’s outcome — still obtain. In brief, the interests of the child may still become “lost in the intricacies of the adjudicatory process.”
Finally, the Law Guardian notes that in Williams v Lambert (902 F Supp 460 [SD NY 1995]), the court concluded that section 516 was constitutionally infirm, and a similar result was reached by appellate courts of several other jurisdictions when addressing their comparable statutes. (See, Department of Pub. Aid ex rel. Cox v Miller, 146 Ill 2d 399, 586 NE2d 1251 [1992]; Gerhardt v Estate of Moore, 150 Wis 2d 563, 441 NW2d 734 [1989]; Crego v Coleman, 226 Mich App 815, 573 NW2d 291 [1997], opn vacated and superseded 232 Mich App 284, 591 NW2d 277 [1998]; Dones v Thomas, 210 Mich App 674, 534 NW2d 221 [1995].) By and large, however, these cases cannot be deemed persuasive here.
First, several resolved litigation brought not by the mother, but by the child (Dones v Thomas, supra; Gerhardt v Estate of Moore, supra), or on behalf of the child by the concerned social services agency (Department of Pub. Aid ex rel. Cox v Miller, supra). As noted at the outset, that distinction is exceptionally significant. (See, e.g., Matter of Marytherese M. v Lee W., 213 AD2d 647, supra; Matter of Commissioner of Social Servs. [Adriana G.] v Ruben O., 80 NY2d 409, supra.) And, it again merits emphasis that the instant controversy does not present the issue of the child’s rights vis-a-vis the putative father or provide a platform for the issue’s resolution.
Moreover, several of the cited cases frame the issue as being whether a statute may constitutionally bar the modification of support agreements made by parents of illegitimate children when agreements for the support of marital children are always subject to modification. (Williams v Lambert, supra, 902 F Supp, at 461; Dones v Thomas, supra, 210 Mich App, at 678-679, 534 NW2d, at 223.) As noted previously, we accept fully these courts’ conclusions that the Constitution precludes such disparate treatment to the extent that paternity of the illegitimate child is established. These cases, however, did not directly address the question presented here, i.e., whether the same result should obtain where there is no such finding. Indeed, in Dones, paternity had been established. (210 Mich App, at 675-676, 534 NW2d, at 222.)
*257 In the end, therefore, the only case cited by the Law Guardian that can be fairly viewed as addressing the issue presented here is Crego v Coleman (supra). And there the finding of unconstitutionality was ultimately made by a divided Special Panel of the Michigan Court of Appeals, which had been convened to resolve prior conflicting decisions by two different panels of that court. (See, Crego v Coleman, 232 Mich App 284, 591 NW2d 277, supra.) Suffice it to say, on this close issue, for the reasons stated, we decline to adopt the reasoning of the Crego majority.
Conclusion
Petitioner’s objections to the order of the Hearing Examiner are denied. The petition is dismissed.

. The facts concerning the prior litigation are not seriously in dispute. They are culled in the main from the November 17, 1997 affirmation of Bonnie Rabin, Esq. (respondent’s counsel), and the exhibits thereto, and petitioner’s affidavit of December 1, 1997, and the exhibits thereto, all of which were submitted to the Hearing Examiner.

. By paragraph 9 of the Agreement, petitioner “represented] that she has been well and ably represented by capable counsel of her own choice in the negotiation, consideration and execution of this agreement.” Respondent made an identical representation.

. Formally, respondent has framed his motion as one seeking relief upon several distinct bases. He thus seeks dismissal “based on the existence of a fully executed Agreement made pursuant to Family Court Act § 516.” In addition, dismissal is sought under CPLR 3211 (a) (1) (defense founded upon documentary evidence); 3211 (a) (2) (lack of subject matter jurisdiction); 3211 (a) (5) (defense based upon collateral estoppel and res judicata); and 3211 (a) (7) (failure to state a cause of action). All of these arguments, however, are permutations of the fundamental hypothesis that the proceeding is barred by operation of the Agreement. Accordingly, they will not be separately ad- '■ dressed,.

. In addition, as reflected by the record of the approval hearing, the notice provision of section 516 (b) was also satisfied.

. The minutes are annexed as exhibit A to the July 24, 1998 affirmation of the Law Guardian, Rochelle H. Yankwitt, Esq.

. Section 413 (1) (a) provides, in pertinent part: “[T]he parents of a child under the age of twenty-one years are chargeable with the support of such child and, if possessed of sufficient means or able to earn such means, shall be required to pay for child support a fair and reasonable sum as the court may determine.”
Section 513, in turn, provides: “[E]ach parent of a child bom out of wedlock is chargeable with the support of such child including the child’s funeral expenses and, if possessed of sufficient means or able to earn such means, shall *246 be required to pay child support. A court shall make an award for child support pursuant to subdivision one of section four hundred thirteen of this act.”
The fact that there are two such provisions is in keeping with the statutory scheme under which Family Court Act article 4 deals with support of marital children and article 5 deals with children bom out of wedlock. (See, Besharov, Practice Commentaries, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 413; see, Matter of Kathy G. J. v Arnold D., 116 AD2d 247 [2d Dept 1986], Iv dismissed 68 NY2d 713, cert denied 479 US 1054 [1987].)

. Compare, Matter of Jason H. v John C. (226 AD2d 638 [2d Dept 1996] [child bound by mother’s unsuccessful paternity suit], with Matter of Elacqua v James EE. (203 AD2d 688, 689 [3d Dept 1994] [child not bound by results of prior proceedings which “were not fully litigated by the mother”]).

. In its entirety, the relevant provision (j[ 6) of the Agreement provides: “Respondent shall maintain, in full force and effect, as long as support is payable under this agreement, term life insurance in the initial amount of $50,000, which coverage shall be reduced to $40,000 on January 1, 1991, to $30,000 on January 1, 1995, and to $20,000 on January 1, 1999. In the event of his death prior to the completion of the payments under the terms of this agreement, the payment of the aforementioned life insurance shall be the sole benefit to the child upon his death. In the event of his failure to maintain *248 said policy in full force and effect, a claim may be made against his estate for the balance due the child under this agreement.”
Respondent maintained the policy in the required amounts but apparently was prohibited by his insurance company from naming Thomas his beneficiary, notwithstanding the request in his insurance application that it be done. His estate was thus named the beneficiary.

. See, n 6, supra.

. An acknowledgment of paternity may serve in the stead of an order of filiation. (See, Family Ct Act § 516-a.)

. As used herein, the term “blood test” encompasses the blood genetic marker or DNA tests referred to in Family Court Act § 532.