96 N.Y.2d 244 (2001)
750 N.E.2d 1068
727 N.Y.S.2d 20
In the Matter of CLARA C., Appellant,
v.
WILLIAM L., Respondent.
Court of Appeals of the State of New York.
Argued March 21, 2001.
Decided May 3, 2001.
*245 Butterman, Kahn & Gardner, L. L. P., New York City (Jay R. Butterman and Howard A. Gardner of counsel), for appellant.
Children's Law Center, Brooklyn (Barbara H. Dildine of counsel), Law Guardian.
*246 Cohen Hennessey & Bienstock, P. C., New York City (Harriet Newman Cohen, Peter Bienstock and Bonnie E. Rabin of counsel), for respondent.
Chief Judge KAYE and Judges ROSENBLATT and GRAFFEO concur with Judge CIPARICK; Judge LEVINE concurs in result in a separate opinion in which Judges SMITH and WESLEY concur.

*247 OPINION OF THE COURT
CIPARICK, J.
In this paternity proceeding, we are called upon to decide whether a putative father can invoke Family Court Act § 516 to bar a mother from seeking additional child support, where the parties entered into a support agreement that was approved by the court without regard for the child's needs. Under the facts presented here, we conclude that he cannot.
In 1983, petitioner Clara C., then a college student, gave birth to her son, Thomas L. C. In 1986, she commenced a paternity proceeding against her former professor, respondent William L. Although blood tests revealed a 99.9% probability of paternity, the parties entered into a settlement agreement pursuant to Family Court Act § 516. Without admitting paternity, William agreed, among other things, to pay monthly child support of $275 until Thomas's 21st birthday, and to maintain a life insurance policy as security for those payments in the event of his own death. In exchange, Clara agreed to dismissal of the pending paternity proceeding with prejudice and to forbear bringing any future paternity or support proceedings, provided that William satisfied the terms of the agreement.
After executing the agreement, the parties, along with the Department of Social Services, appeared before Family Court for approval of the agreement pursuant to section 516 (a). Although Clara and William were represented by counsel, no law guardian had been appointed to represent Thomas. The court asked counsel whether the "matter was settled by the attorneys" *248 and whether an order of filiation had been made, to which William's attorney replied, "This is compromising the entire deal, the paternity and the support. That's what [section] 516 is." The court then marked the case "settled" without further inquiry. When counsel asked the court to probe further into whether the parties read the agreement and considered it to be fair and acceptable, the court refused, stating "I assume if your clients [are] in this court and you represent them it is settled."
Ten years later, Clara commenced the instant proceeding for a declaration of paternity and an order increasing Thomas's support to meet his current educational needs. On William's motion, the Hearing Examiner dismissed the proceeding, concluding that it was barred by the terms of the section 516 agreement. Clara objected to the Hearing Examiner's determination, arguing that the agreement was unenforceable because William failed to comply with its terms. Alternatively, she maintained that section 516 violates equal protection because, unlike marital children, nonmarital children whose mothers have entered into section 516 agreements are precluded from seeking additional child support. Before considering Clara's objections, Family Court appointed a law guardian to represent Thomas. The law guardian adopted the constitutional argument and added that the agreement was invalid because the court failed to determine whether adequate provision had been made for Thomas.
Family Court denied the objections to the Hearing Examiner's order and upheld dismissal of the petition. Among other things, the court rejected Clara's claim that William failed to comply with the agreement, concluding that any noncompliance was immaterial (181 Misc 2d 241, 247). Moreover, although the court recognized that a "more thorough review of the [a]greement's adequacy might be deemed salutary" (id., at 248), it refused to invalidate the agreement on this basis, noting that any attempt to undo the 12-year-old agreement would undermine the strong policy favoring the finality of settlements. Finally, the court upheld the constitutionality of section 516 and concluded that appellate courts have consistently enforced such agreements. The Appellate Division affirmed "for reasons stated" by Family Court (274 AD2d 583). We now reverse.
Family Court Act § 516 allows a mother and a putative father of a nonmarital child to settle a paternity proceeding by entering into a binding support agreement that waives future support. It provides, in pertinent part:

*249 "(a) An agreement or compromise made by the mother or by some authorized person on behalf of either the mother or child concerning the support of either is binding upon the mother and child only when the court determines that adequate provision has been made and is fully secured and approves said agreement or compromise. * * *
"(c) The complete performance of the agreement or compromise, when so approved, bars other remedies of the mother or child for the support and education of the child" (emphasis added).
The language of the statute is clear: a support agreement will be enforced "only when" a court has reviewed the agreement and determined that adequate support for the child has been made (Family Ct Act § 516 [a]).[*]
This requirement reflects a longstanding legislative policy of protecting the welfare of children born out of wedlock. Section 516 (L 1962, ch 686) replaced Domestic Relations Law former § 121 (L 1925, ch 255). Prior to the enactment of section 121, settlements for the support of nonmarital children were commonly made by local welfare officials and required no court approval. Concerned that these settlements were inadequate to support the child, the Legislature amended the law to require judicial approval of certain settlements before releasing the father from his obligations (see, Mem of Women's City Club of New York, Bill Jacket, L 1925, ch 255, at 9-10).
Section 516 (a), like its predecessor, provides that a compromise agreement is not binding on the parties unless a court approves it and determines that adequate provision for the child's support has been made. The purpose of this requirement is to ensure that the needs of nonmarital children are adequately met and are not contracted away by their mothers, whose interests may not always coincide with those of their children (see, Avildsen v Prystay, 171 AD2d 13, 14-15, appeal dismissed 79 NY2d 841; Sobie, New York Family Court Practice § 7.19, at 380 [10 West's New York Practice Series 1996]; 1 Vitek, Disputed Paternity Proceedings § 2.05 [4] [a], at 2-88 [5th ed]). Indeed, judicial scrutiny prevents overreaching by the parties and safeguards the interests of children who, like Thomas, *250 may not be represented by a law guardian. While section 516 prescribes no particular inquiry for determining the adequacy of support, courts have generally considered the parties' financial positions, the child's support and educational needs throughout childhood and the interests of the State (see generally, Andre v Warren, 248 AD2d 271, 271-272; Matter of Michelle W. v Forrest James P., 218 AD2d 175, 178; Matter of Carmen V. v Bruce R., 115 Misc 2d 377, 379-380). Regardless of the inquiry used, a court must determine the fairness and adequacy of a proposed agreement before approving it (Family Ct Act § 516 [a]). Absent judicial review and approval, the agreement will not be enforced to preclude a later modification of support (id.).
Here, Family Court's perfunctory approval of the agreement, without any determination as to its adequacy, failed to satisfy the requirements of section 516. Nothing in the record indicates that the court considered the parties' financial situation or whether the agreed-upon amount of support adequately met Thomas's needs throughout childhood. To the contrary, when counsel asked the court to inquire whether the parties considered the agreement to be fair, the court refused, stating only that the matter was "settled." Although Clara voiced no objection to the agreement for over 10 years, her failure to object does not justify enforcement of an agreement that was approved without any determination that adequate provision had been made for the child. Because the court made no determination as to the adequacy of the support, the agreement fails to conform to section 516. Thus, William may not invoke the statute to bar the instant proceeding for a declaration of paternity and an increased support order to meet Thomas's ongoing educational needs.
Having determined that the agreement here does not comply with the requirements of section 516, we have no occasion to consider the constitutionality of that section. Moreover, we do not pass upon the continuing viability of Bacon v Bacon (46 NY2d 477), decided nearly a quarter-century ago. We are bound by principles of judicial restraint not to decide constitutional questions "unless their disposition is necessary to the appeal" (People v Carcel, 3 NY2d 327, 330; see also, Matter of Cipolla v Golisano, 84 NY2d 450, 455; Peters v New York City Hous. Auth., 307 NY 519, 527-528). Because a compelling nonconstitutional ground resolves this appeal, we refrain, at this time, from addressing the constitutional issues raised.
Accordingly, the order of the Appellate Division should be reversed, with costs, and the matter remitted to Family Court for *251 further proceedings in accordance with the opinion herein. The certified question should not be answered upon the ground that it is unnecessary.
LEVINE, J. (concurring).
We concur, but on the alternative ground that, as applied in this case, Family Court Act § 516 unconstitutionally denied the child Thomas L. C.'s right to the equal protection of the laws (US Const, 14th Amend; NY Const, art I, § 11). Undoubtedly, general norms of judicial restraint counsel appellate courts to avoid reaching constitutional issues not necessary for deciding an appeal. The rule, however, is not absolute, and the threshold for deviating from it is not high. This Court, on a number of occasions, has concluded that the rule should yield when the constitutional issue is "fairly presented to us, and public interests require that it should be determined" (People ex rel. Unger v Kennedy, 207 NY 533, 541; see, Matter of Bell v Waterfront Commn. of N. Y. Harbor, 20 NY2d 54, 61).
Typically, we have chosen to reach the constitutional issue when, arguably, it could have been avoided on mootness grounds (see, Blye v Globe-Wernicke Realty Co., 33 NY2d 15, 19; Matter of Concord Realty Co. v City of New York, 30 NY2d 308, 312-313; Matter of Oliver v Postel, 30 NY2d 171, 177-178). What all of the cases have in common is a perceived need to have the particular constitutional issue resolved promptly in order to avoid unsettled law, when the issue is likely to recur and the public interest would be served by achieving early certainty. Thus, in People ex rel. Unger (supra), the Court reached the issue of the constitutionality of the statute creating Bronx County and its separate courts, although the legality of the relator's murder conviction could be (and was) upheld irrespective of the validity of the statute. And in Matter of Bell v Waterfront Commn. (supra), this Court chose to address the petitioner's constitutional attack and then construed the Waterfront Commission Act narrowly to uphold its constitutionality, although as the Court noted, "in view of the petitioner's fraud and deception, there [was] ample basis for denying [petitioner] the opportunity of challenging the constitutionality of the statute" (20 NY2d, at 60).
The need to resolve the constitutional issue here is at least as compelling as in any of the cited cases. Some 22 years ago, in Bacon v Bacon (46 NY2d 477), this Court rejected an equal protection challenge to the validity of Family Court Act § 516, concluding that the discriminatory statutory treatment of nonmarital *252 children provided in that section bore a substantial relationship to permissible State interests (see, id., at 480). Today, as will be discussed below, at least three of us have concluded that the State interests identified and relied upon in Bacon are attenuated here, due to the impact of subsequent legal developments and advances in genetics, and that section 516 is unconstitutional as applied in the circumstances of this case. Our concurring position at minimum raises serious doubts as to the continued general efficacy of compromise arrangements under section 516, even when the Family Court meticulously performs its statutory obligation to ensure the adequacy of the child support provisions of the agreement. Yet, unquestionably, Family Courts will be completely bound under our Bacon precedent to approve such agreements upon a determination that their support provisions are adequate. Leaving the constitutional issue in limbo until another case makes its way to our Court in which the settlement was properly approvedso that the constitutional issue would have to be reacheddoes not serve the best interests of nonmarital children, their mothers or putative fathers in paternity matters. Therefore, we proceed to address the equal protection issue raised on behalf of Thomas L. C.
In a series of cases beginning with Levy v Louisiana (391 US 68 [1968]), the Supreme Court of the United States has struck State statutory and decisional law classifications which more favorably treated children of married parents than nonmarital children (see, generally, A. Mayefsky and G. von Stange, Should Children Be Penalized Because Their Parents Did Not Marry? A Constitutional Analysis of Section 516 of the New York Family Court Act, 26 U Tol L Rev 957, 967-973). In those cases, the Supreme Court fashioned an intermediate level of scrutiny for equal protection analysis, impelled by recognition of the fundamental unfairness of imposing legal burdens upon a nonmarital child for conduct of its parents over which it had no responsibility or ability to control, and the history of discriminatory treatment of children based on illegitimacy (see, Pickett v Brown, 462 US 1, 7-8). Therefore, "a classification based on illegitimacy is unconstitutional unless it bears `an evident and substantial relation to the particular . . . interests [the] statute is designed to serve'" (id., at 8 [quoting United States v Clark, 445 US 23, 27] [interior quotation marks omitted] [alterations in the original]).
A series of discriminatory classifications regarding the rights of nonmarital children to paternal support has been examined *253 by the Supreme Court. In Gomez v Perez (409 US 535) the Court declared:
"We therefore hold that once a State posits a judicially enforceable right on behalf of children to needed support from their natural fathers there is no constitutionally sufficient justification for denying such an essential right to a child simply because its natural father has not married its mother" (id., at 538).
The Supreme Court has also invalidated several State Statutes of Limitation (ranging from one to six years) barring suits to establish paternity and obtain support, on the ground that the periods of limitation lacked a substantial relationship to the professed State interests in forestalling stale or fraudulent claims of paternity (see, Clark v Jeter, 486 US 456; Pickett v Brown, supra; Mills v Habluetzel, 456 US 91).
Family Court Act § 516 treats the support rights of nonmarital children whose mothers have entered into court-approved compromises of paternity disputes differently from the support rights of children born of married parents in two important respects. First, a child born in wedlock is never precluded from enforcing a statutory right of support from its father, based upon that parent's means under statutory support standards applied as of the time of the proceeding (see, Family Ct Act § 413 [1]). Second, notwithstanding the existence of a stipulation on child support between married parents incorporated into a separation agreement or a decree of separation or divorce, their child is not precluded from enforcing a statutory right to additional support by way of a modification of the child support terms, because such an agreement or decree "does not eliminate or diminish either parent's duty to support a child of the marriage under section four hundred thirteen of this article" (Family Ct Act § 461 [a] [emphasis supplied]; see, Matter of Brescia v Fitts, 56 NY2d 132, 138-141).
Contrariwise, a nonmarital child who was the subject of a Family Court Act § 516 compromise approved by the court, and fully performed by the putative father, is forever barred from seeking either an initial order of support through a paternity proceeding under Family Court Act article 5, or from seeking modification of the court-approved agreement entered into by its mother.
We recognized in Bacon (46 NY2d 477, supra) that the foregoing burdens on rights of support, not imposed when marital *254 children seek support from their fathers, trigger the intermediate level of scrutiny to determine whether the statutory scheme satisfied equal protection. That conclusion remains valid today. In this regard, we are unpersuaded by the Michigan Supreme Court's decision in Crego v Coleman (463 Mich 248, 615 NW2d 218), relied upon by respondent here. The statute in Crego, like Family Court Act § 516, only gave preclusive effect to paternity dispute settlements when the paternity of the child was not established. The Crego court concluded, therefore, "that the statute has not created a classification on the basis of illegitimacy, but rather has created a classification on the basis of whether paternity had been legally determined" (id., 463 Mich, at 264, 615 NW2d, at 226 [emphasis in the original]). That being so, the court held that only the minimum level of scrutiny of the classification was required. The court determined that the statutory distinction had the requisite rational basis.
The Crego analysis, in our view, disregarded the undisputable fact that the statutory scheme favored marital children over at least one class of nonmarital childrenthose (like Thomas L. C. here) whose paternity had not been established when their mothers entered into the compromise agreements. This demonstrably conflicts with the equal protection jurisprudence of the Supreme Court of the United States in its line of cases dealing with State discrimination against nonmarital children. Thus, in Weber v Aetna Cas. & Sur. Co. (406 US 164), the Supreme Court invalidated a workers' compensation statute under which a deceased father's marital children and his acknowledged nonmarital children were awarded priority to death benefits over his unacknowledged nonmarital children. The Supreme Court held:
"The inferior classification of dependent unacknowledged illegitimates bears, in this instance, no significant relationship to those recognized purposes of recovery which workmen's compensation statutes commendably serve" (id., at 175 [emphasis supplied]).
Similarly, in Pickett v Brown (462 US 1, supra), the two-year Statute of Limitations for paternity suits contained an exception for nonmarital children whose paternity was acknowledged by the father in writing or by the furnishing of support (see, 462 US, at 3, n 1). The statutory scheme in Pickett nonetheless was subjected to heightened scrutiny by the Court, because it *255 "restricts the right of certain illegitimate children to paternal support in a way that the identical right of legitimate children is not restricted" (id., at 12 [emphasis supplied]). Thus, the fact that the statutory framework in article 5 of the Family Court Act may also make distinctions among classes of nonmarital children for support purposes does not relieve Family Court Act § 516 from the intermediate level of scrutiny insofar as it severely "restricts the right of certain [nonmarital children] to paternal support" in a way not visited upon children born of married parents.
In applying the intermediate level of scrutiny for equal protection analysis to the application of Family Court Act § 516 here, we conclude that the discriminatory treatment of Thomas L. C., in permanently barring him from seeking a paternity adjudication and support according to his father's current means, bears no substantial relationship to a legitimate State interest. Notably, advances in genetic testing after Bacon, and later developments in statutory and decisional law regarding paternity litigation and support of nonmarital children as applied in this case, have attenuated the relationship between the discriminatory statutory classification and the State interests we relied upon in Bacon (supra).
The Bacon case identified two "important and legitimate ends * * * fostered by [Family Court Act § 516]" (46 NY2d, at 480). First, the State has an interest generally in reducing and disposing of litigation in the courts through settlement agreements like those provided by section 516. Second, and "[m]ore important, the challenged statute helps to ensure that the child will not be without support from his father" (id.). Assuring a source of paternal support for a nonmarital child was of paramount importance at the time of Bacon because paternity proceedings then invariably "involved complex and difficult problems of proof, and uncertainty as to the outcome" (id.). The problems of proof in paternity cases were indeed formidable when the Bacon decision was written. Blood testing results were merely capable of excluding paternity, and then only in certain instances. If paternity was not excluded, the case often turned on resolution of credibility disputes, in which the elevated standard of proof of paternity, by "`clear and convincing' evidence, evidence which is `entirely satisfactory'" (Matter of Commissioner of Social Servs. v Philip De G., 59 NY2d 137, 141-142), strongly disfavored the petitioner.
In the instant case, the "complex and difficult problems of proof" our Court in Bacon found to be indigenous to paternity *256 litigation largely disappear. Science has since developed to the point that genetic testing of tissue or blood is capable, not only of excluding, but also proving paternity, in some cases to an exceptionally high degree of probability. The Legislature recognized this scientific advancement, first by amending Family Court Act § 532 to provide for the admissibility of HLA testing results, both to prove or disprove paternity (L 1981, ch 9, § 2), then to make admissible blood genetic marker test results (L 1984, ch 792, § 2) and ultimately to provide for the admissibility of DNA testing results to prove paternity, and to create a rebuttable presumption of paternity when blood genetic markers or DNA test results "indicate[d] at least a ninety-five percent probability of paternity" (L 1994, ch 170, § 354).[*]
In the instant case, HLA blood test results established a 99.9% probability that William L. was Thomas's father. Thus, today if Thomas's mother were to proceed to trial on her paternity petition against William L., she would benefit both from the statutory presumption of paternity, and from genetic testing results indicating the maximum probability of his parentage of Thomas. In fact, the strength of Thomas's claim to being William L.'s son would be virtually indistinguishable from that which he would enjoy under the venerable presumption of legitimacy had his mother been William's wife when he was born (see, Matter of Findlay, 253 NY 1, 7-8).
Under the foregoing circumstances, the relationship between Family Court Act § 516 and the State's ostensible interest in promoting the best interest of the nonmarital child, by assuring paternal support and avoiding the vagaries of paternity litigation (here largely non-existent) cannot be considered substantial. Indeed, application of Family Court Act § 516 under the circumstances here is antithetical to Thomas's best interests. Notably, the special problems of proof in paternity cases were also claimed, in Pickett v Brown (supra), to provide *257 a justification for a short Statute of Limitations to avoid the risk of stale or fraudulent paternity claims. The Supreme Court concluded that the State's justification for the paternity Statute of Limitations had become more "attenuated"hence much less substantial"as scientific advances in blood testing have alleviated the problems of proof surrounding paternity actions" (462 US, at 17 [emphasis supplied]). The same reasoning applies in Thomas L. C.'s case.
Subsequent interpretations of State child support and paternity laws further lead us to conclude that the relationship between Family Court Act § 516 and the State's interests in the settlement of legal disputes generally is similarly too attenuated to be substantial here. In Matter of Commissioner of Social Servs. of City of N. Y. v Ruben O. (80 NY2d 409), in interpreting article 5 of the Family Court Act, we held that: (1) notwithstanding the existence of a court-approved and fully performed section 516 compromise agreement, public welfare authorities were not precluded from bringing a paternity proceeding on behalf of a nonmarital child receiving public assistance, and (2) once paternity was established, the court was free to fix support in accordance with the guidelines of Family Court Act § 413, without regard to the amount stipulated in the section 516 settlement or the level of public assistance. Additionally, as previously discussed, in interpreting article 4 of the Family Court Act, we held in Matter of Brescia v Fitts (56 NY2d 132, supra) that a marital child was not precluded from seeking support above the amount agreed to by its parents as part of a legal separation or divorce.
The just described overall statutory scheme regarding paternity and child support itself undercuts the substantiality of the relationship between the State's general interest in promoting settlements of legal disputes and enactment of Family Court Act § 516. There is little apparent reason, apart from purely invidious discrimination, why the State's general interest in settling lawsuits with finality should be greater in the case of a nonmarital child seeking an adjudication of paternity than when either: (1) a public welfare official is seeking to establish paternity and an order of support unlimited by the same child's public assistance grant; or (2) a marital child of separated or divorced parents is seeking additional paternal support. Pickett v Brown (supra) holds that similar exceptions "undermine" the State's substantial relationship argument (462 US, at 15).
Nor has respondent posited persuasively any other State interest to which Family Court Act § 516 is substantially related *258 as applied in this case. The interests identified could largely be satisfied here either by other statutory devices or by the exercise of discretionary authority of the Family Court, without subjecting Thomas L. C. to the discriminatory treatment resulting from the enforcement of section 516's preclusive effect. In respect to any important State interest at stake here, we note that the Attorney General was put on notice pursuant to Executive Law § 71 of the constitutional challenge to Family Court Act § 516 in this case, yet declined to appear in defense of the constitutionality of the statute's application here.
For all of the foregoing reasons, we would reverse, declare that Family Court Act § 516 is unconstitutional as applied in this case, and remit to Family Court, Kings County, for further proceedings consistent herewith.
Order reversed, etc.
NOTES
[*] Other jurisdictions have similarly required judicial scrutiny and approval of such agreements (see, e.g., Willerton v Bassham, 111 Nev 10, 22, 889 P2d 823, 830-831; Tuer v Niedoliwka, 92 Mich App 694, 700, 285 NW2d 424, 427; Fox v Hohenshelt, 19 Ore App 617, 628-629, 528 P2d 1376, 1381).
[*] Indeed, the dramatic impact of these scientific and legal developments on paternity litigation is highlighted by a case decided by this Court in 1985, Matter of Jane PP. v Paul QQ. (65 NY2d 994). In that case, the Court concluded that the petitioner failed to establish paternity by "clear and convincing" evidence, as a matter of law, where there was proof that another man had sexual relations with the petitioner "during the critical time period" (id., at 996). Significantly, instead of dismissing the petition, the Court remitted the matter to Family Court for a new hearing, noting that an HLA test had been administered which, if admitted into evidence, "could elevate the evidence to meet the requisite standard of proof" (id.; see also, Alexander, 1994 Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C4518:11, 2001 Pocket Part, at 35-36).